UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

PETER M. BERGNA,

                             Petitioner,

    v.

JAMES BENEDETTI, et al.,

                            Respondents.

Case No. 3:10-cv-00389-RCJ-WGC

ORDER

This counseled amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 by state prisoner Peter M. Bergna is before the court for final disposition on the merits (ECF No. 55).  Respondents have answered the petition (ECF No. 59), and Bergna replied (ECF No. 60).

**I.      Procedural History and Background**

On November 15, 2000, the State of Nevada filed an indictment in state district court charging Bergna with one count of murder (exhibit 1 to petition).[1]   A jury trial commenced on October 1, 2001, and ended in a mistrial on November 20, 2001.  Exh. 2, pp. 16-60.  The state elected to retry petitioner, and a second jury trial commenced on May 6, 2002.  Exh. 109.  On June 19, 2002, the jury returned a verdict finding petitioner guilty of first-degree murder.  Exh. 208.  Petitioner was sentenced to life imprisonment with the possibility of parole after 20 years.  Exh. 210.  Judgment of conviction was filed on October 28, 2002.  Exh. 230.

---

[1] The exhibits referenced in this order are exhibits filed by petitioner and are found at ECF Nos. 14-27 and 36.

On December 20, 2004, the Nevada Supreme Court affirmed petitioner's conviction. Exh. 254.  On March 24, 2006, petitioner filed a postconviction petition in state district court.  Exh. 264.  The court denied claims 1 through 18 on August 8, 2007, and set an evidentiary hearing on claims 19 and 20.  Exh. 274.  On October 31, 2007, and November 1, 2007, the state district court held an evidentiary hearing.  Exhs. 276-277. The state district court denied postconviction relief on August 1, 2008, the Nevada Supreme Court affirmed on June 10, 2010, and remittitur issued on July 14, 2010. Exhs. 283, 285, 297, 298.

Bergna dispatched his federal petition for writ of habeas corpus to this court on June 24, 2010 (ECF No. 1).  On September 21, 2012, this court granted respondents' motion to dismiss in part, concluding that ground 9 was unexhausted (ECF No. 40).  Petitioner filed a notice of abandonment of ground 9 (ECF No. 56), and now before the court is petitioner's amended petition, which sets forth the remaining grounds (ECF No. 55).

## II.    LEGAL STANDARDS

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S.

685, 693-694 (2002). This Court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir.2004). This clause

3

requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

**III.    The Instant Petition**

### A.  Grounds 1, 3, and 4

Respondents renew the arguments that they raised in their motion to dismiss that grounds 1, 3, and 4 are procedurally barred from federal review.  Generally, procedural default is a preliminary issue to be considered before a federal court turns to the merits of a claim.  *Lambrix v. Singletary*, 520 U.S. 518, 524 (1997); *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1305 (9th Cir. 1996).  However, when the procedural default question is relatively complicated or when relief is due to be denied even if claims are not procedurally barred, a federal court is authorized to skip over the procedural default issue and proceed to deny the claim on the merits.  *Id.*  As discussed below, grounds 1, 3, and 4 shall be denied on the merits.

### i.  Ground 1

Bergna claims that his first-degree murder conviction and his sentence are invalid in violation of his Fifth, Sixth and Fourteenth Amendment due process rights because the

State failed to introduce sufficient evidence that his wife died as a result of a criminal act rather than as the result of an accident (ECF No. 55, pp. 11-76).

"The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979) (citing *In re Winship*, 397 U.S. 358 (1970)).  On federal habeas corpus review of a judgment of conviction pursuant to 28 U.S.C. § 2254, the petitioner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324.  "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.  On habeas review, this court must assume that the trier of fact resolved any evidentiary conflicts in favor of the prosecution and must defer to such resolution. *Id.* at 326.  Generally, the credibility of witnesses is beyond the scope of a review of the sufficiency of the evidence. *Schlup v. Delo*, 513 U.S. 298, 330 (1995).

A jury convicted Bergna of the first-degree murder of his wife, Rinette Rinella Bergna.  On May 31, 1998, Bergna picked Rinette up from the Reno airport when she returned from a trip to Italy and drove her in his truck to a certain turn in State Route 431 near what is known as Slide Mountain.  The State's theory was that Bergna made a sharp turn in the road while traveling 30 mph, drove the truck into the guardrail and jumped out of the truck, which tumbled and then crashed some 800 feet below, killing Rinette (ECF No. 59, p. 10).  Bergna has maintained throughout that he lost control of the truck, and it went through the guardrail.  He claims he was not wearing a seatbelt because he was leaning out his open window smoking a cigar, was ejected through the driver's window and landed about eighty feet below the road, while the truck eventually landed about 800 feet below the road (ECF No. 55).

*Trial Testimony*

The evidence introduced at trial included the following.  Dewey Willie, the equipment mechanic fleet supervisor for the Nevada Highway Patrol, testified that part of his job is to inspect fatal vehicular crashes and that he had inspected about 230 fatal vehicular crashes in six years.  Exh. 121, pp. 90-162; *see id.* at 97.  He inspected the truck, including brakes, tires, suspension, and steering.  *Id.* at 100.  He stated that he found no unusual mechanical failure whatsoever.  *Id.* at 101.  The seat belt on the passenger side had been cut to extricate Rinette; the passenger side airbag was turned off and the driver's side seat belt was intact and fully retracted, *i.e.*, it was not in use at the time of the incident.  *Id.* at 106.  The windows on both sides were broken; the driver's side window regulator indicated the window was down and the passenger's side window regulator indicated that the window was up.  *Id.* at 109-110.  The emergency brake was not engaged.  *Id.* at 110.  No trail of brake fluid was found on the roadway and no other evidence of an actual rupture of the complete brake hydraulic system was found.  *Id.* at 143.

Willie testified that any tests conducted on the vehicle three or four years later would be problematic because any car sitting in storage for two years or more would suffer dry rot of the rubber components of the braking system.  *Id.* at 156.  Willie testified that he did not attempt to measure the amount of brake fluid that was in the brake system when he performed his inspection.  Exh. 130, p. 74.  He testified that he was unable to ascertain whether the left rear drum brake worked because it was gone, but that the condition of the right rear drum and brake shoes was good.  *Id.* at 78-79.  He testified that he visually inspected the master cylinder and vacuum booster but conducted no other testing on them.  *Id.* at 87-88.   He stated that he did not conduct further tests because there was no recall notice from Ford Motor Company for the braking systems and because this particular truck had not had braking problems prior to this crash.  *Id.* at 84-87.  Exh. 183, pp. 131-137.

The State's expert mechanical engineer Robert H. Turner testified that in his opinion it was not possible that Bergna had been in the truck when it went over the cliff. Exh. 130, pp. 175-184. He explained that if Bergna had been ejected from the truck he would have had about the same velocity as the truck and he would have landed at about the same place the truck landed. *Id.* at 176-177.

Nevada Highway Patrol Trooper Rickey McLellan testified that he responded to the call that a vehicle had gone through a guardrail near the Mt. Rose ski area. Exh. 116, p. 136. When he arrived, as he went toward the opening in the guardrail, he observed a baseball cap on the pavement edge. *Id.* at 142.

Sergeant James Beltron testified that no skid marks or yaw marks were observed on the roadway. Exh. 116, p. 223. He testified that during the police interview Bergna appeared to be "going through the emotions of crying" but was not shedding any tears. Exh. 117, pp. 42-43.

Scott Stoeffler, a chemist and microscopist, testified that he examined various samples and items from the crash. Exh. 126, pp. 135-195. He testified that he identified material consistent with asphalt on Bergna's jacket, shoe and sock. *Id.* at 149, 156, 160, 177; Exh. 128, pp. 22-23. He also testified that there was no evidence that the bottom of either of Bergna's sneakers impacted a road surface at 30-35 mph. Exh. 128, pp. 21-27. He agreed that based on the testing he conducted he could not state with a reasonable degree of scientific certainty that Bergna did not exit out of the truck and land on the hillside in the manner Bergna described to police. *Id.* at 50.

Evidence was presented that Bergna filled up containers of gasoline that night and placed them in the back of his truck, apparently not sealed closed. Exh. 117, pp. 24-31. Evidence was also presented that when Bergna was brought to the emergency room he was wearing a jacket, a "beautiful thick sweat shirt," a dress shirt, a t-shirt, blue jeans and white sneakers. Exh. 118, pp. 169-170. Nurse Jeanine Moorehead testified that Bergna did not seem distressed or distraught when he arrived in the emergency room.

*Id.* at 174.   She testified that thereafter she heard Bergna on the phone having a "horrible heart wrenching sobbing conversation" but when she turned around she was "astonished" because he sounded so horrendous but he had no expression on his face whatsoever and "was just totally kickback . . . and just kind of looking around the room." *Id.* at 174-175.

Defense witness Douglas Neale testified that he was a longtime acquaintance of Bergna and had worked during several different periods of time with Bergna.  Exh. 166, pp. 6-8.  He    testified that Bergna had a habit of keeping five-gallon gas cans in the back of his truck and that he had seen Bergna in a vehicle without a seat belt on occasions.  *Id.* at 9, 11.

Defense expert Terrence McCreary testified that he is an automobile technician and had performed 150-200 vehicle forensic mechanical inspections.  Exh. 166, pp. 17-18. He testified that he inspected Bergna's truck in March, 2002.  *Id.* at 19.  In his opinion, the brake booster was leaking vacuum and that was the largest defect that contributed to the crash.  *Id.* at 19.  He testified that he believed that the booster was leaking before the crash.  *Id.* at 20.  He testified that before a brake failure could have been eliminated in this case, the rear anti-lock braking system (RABS) should have been tested by an independent brake specialist on "some kind of test bench" and that the brake booster itself should have been disassembled and the inside examined.  *Id.* at 36-37.  When the State questioned McCreary, he testified that he was unaware that Bergna had said in his statement to police that there was no brake failure and he had never said there was brake failure.  *Id.* at 40-46, 50-52 (*see also id.* at 48, the prosecution reads from Bergna's statement that was entered into evidence:  "I never said there was brake failure.  I think my brakes worked just fine.").  McCreary acknowledged that there is no evidence that the truck experienced a certain brake problem – a RABS valve leak – but he assumed that it must have because Ford received other such complaints in the same model truck.  *Id.* at 61-62.

8

Geoffrey Genther, a retired detective, also testified for the defense.  He stated that he worked on the Washington State Patrol Traffic Investigation Unit, a nationally recognized leader in collision investigation and reconstruction.  Exh. 184, pp. 11-30.  He testified that it was impossible that Bergna could have jumped out of the truck at 30 mph.  *Id.* at 130.  He based that opinion on his investigations of many car/pedestrian/motorcycle ejection collisions where the speed of the vehicles and the injuries suffered were known.  He testified that the coefficient of friction would have brought Bergna's body down and slammed his head into the pavement at 30 mph.  *Id.* at 131-132.  He noted that a normal survival reaction would be to put your hands out and that broken wrists, elbows, lower arms would be expected.  He testified that he would have expected severe abrasions consistent with tumbling down the hill with no control.  *Id.* at 133.  He testified that he could say with certainty that the truck struck the guardrail, due to the blue paint on the guardrail and the damage to the guardrail.  *Id.* at 134.  He then posited that the truck's momentum slowed considerably when it struck the guardrail, then it began to roll and gravity could have pulled Bergna out of the open window.  *Id.* at 134.  Genther testified that, based on the injuries that Bergna suffered, the truck velocity had to be much, much lower than what law enforcement thought.  *Id.* at 140.

Rinette's former boss testified for the State that she flew into Reno to attend the funeral.  Exh. 125, pp. 125.  She stated that Bergna told her that when he picked up Rinette when she returned from Italy she had wanted to stop and see the city lights before going home.  He recounted that later when he was driving down the mountain his window was open because he was smoking a cigar, and therefore, he fell out of the truck window when it crashed.  *Id.* at 118-121.  She testified that it seemed odd to her at the time that someone who had been traveling for more than twenty hours would want to stop to look at the lights.  She also stated that after the funeral, she and some other attendees went to Bergna's house.  She said that he put his arm around her, told her

9

she was now welcome to come and stay at his house any time and that she found it "creepy and inappropriate." *Id.*

Another nurse and a paramedic testified for the State. Phyllis Tejeda, a CareFlight nurse who was in the helicopter that was dispatched to the crash site, noted generally that there have been incidents where a person was ejected from a vehicle but did not sustain major bodily injury. Exh. 116, p. 91, 129-130. She testified that when Bergna was placed in the helicopter he complained of back pain and that his vital signs were good. *Id.* at 103-106. He was crying out and seemed anxious, and the nurse noted that he was not shedding any tears. *Id.* at 11-12.

Paramedic Jeffrey Zambrano testified that, generally, ejections are associated with major injury. Exh. 116, p. 6. He stated that he was surprised when Bergna said he had been ejected because his injuries were not consistent with injuries Zambrano has seen with patients who had been ejected. *Id.* at 18. Zambrano determined that Bergna was in stable condition and saw no need to administer oxygen, an IV, or put a heart monitor on him. *Id.* at 22. He also acknowledged that he has seen an ejection from a vehicle where the person was not injured. *Id.* at 23, 59.

Kay Sweeney, a defense forensics expert, testified that based on the evidence he reviewed, he could state to a reasonable degree of scientific certainty that Bergna exited the truck in the area of the bank of the hillside and impacted the bank on the way down. Exh. 139, p. 123; pp. 32-136.

Dean Jacobsen, a defense materials science engineering expert, testified that he has seen ejections where people have gotten up and walked away and ejections where people have been killed. Exh. 178, pp. 48-49. He stated that there is such a variety of objects on the hill where the truck crashed and that it would have depended on what part of Bergna's body hit the ground and what his body movements were. *Id.* He testified that in his opinion Bergna did not exit the truck voluntarily and land on the asphalt. Exh. 175, p. 118; 119-176.

10

A neighbor, members of Rinette's family, Bergna's former wife, and a jailhouse informant also testified for the State.  Cindy Glatz testified that she lived across the street from the Bergnas.  Exh. 128, pp. 175-184.  Glatz testified that during the last year that Rinette lived at the house, Rinette traveled a lot more and Glatz hardly saw her except when she was departing for a trip.  She testified that one day she watched Rinette bringing baggage to her car and that Peter Bergna tracked her with the snowblower and aimed it at her at close range and followed her, blowing snow on her as she walked from the front of the house to the car and aimed it into the car when she opened the door.  Glatz stated that Rinette looked extremely upset and fearful.  *Id.* at 182.  Glatz testified that she continued watching because she wondered if the situation would escalate and whether she might have to help or call 911.  *Id.* at 184.

Mikki Riella, Rinette's sister-in-law, testified that within two to three months after Rinette's death, Bergna had gotten rid of most if not all of Rinette's belongings.  Exh. 125, pp. 9-10.  Jacque Riella, a sister-in-law of Rinette, testified that money was very important to Bergna.  Exh. 191, pp. 70-72.

Rebecca Tillery, Bergna's former wife, testified.  Exh. 188, pp. 121-131. She stated that Bergna portrayed himself to friends and family as outgoing, gregarious and a really nice guy and that privately he was extremely volatile and angry towards her.  *Id.* at 125-126.  She testified that she constantly walked on egg shells around her husband and lived in fear.  *Id.* at 130-131.  She testified that money was "pretty much everything to him" and that she felt that he gained his self-worth through money.  *Id.* at 133.

Nevada state inmate Darrell Coursey testified that he and Bergna had been housed at the Washoe County Jail and were in a Bible study group together.  Exh. 128, p. 114.  Coursey testified that Bergna told him that he had killed his wife because of financial issues and because she did not want to have children.  Exh. 128, p. 114, 125.  He testified that Bergna told him that Rinette was unconscious when he drove the truck off the road and that he had jumped out of the window.  *Id.* at 126.  He stated that Bergna

told him that he did not think he would be convicted because he had a good attorney. *Id.* at 133.

On cross examination, Bergna's counsel elicited testimony from Coursey that the alleged conversation with Bergna took place about the third week in July, 2001, and that at Coursey's sentencing hearing on July 31, 2001, he asked the court to postpone the hearing because he had work to do on behalf of law enforcement.  *Id.* at 146-147. He also acknowledged that he told police initially that he learned Bergna's name from a mailing label on a New York Times, but later testified at Bergna's first trial that it was a USA Today.  *Id.* at 150-151.  Coursey testified that he is serving a ten to twenty-five-year term and agreed with defense counsel that if the district attorney sent a favorable letter when he was being considered for parole that it "probably wouldn't hurt."  *Id.* at 171-172.

Defense witness Alan Walker testified that he was a friend of both Bergna and Rinette.  Exh. 183, pp. 63.  He stated that he and his family spent time with Bergna during Rinette's six-week Italy trip, that he had been with Bergna earlier on the day of the crash and that he did not notice that anything was out of the ordinary during those times.  *Id.* at 63-72.

*Ground 1 Discussion & Analysis*

Bergna argues that the State failed to gather and document evidence at the scene (ECF No. 55, pp. 24-28).  He notes that heavy foot traffic by medical personnel navigating the steep terrain and the loose dirt and gravel eliminated any possibility of later inspecting the guard rail area for tire marks and made it difficult to determine with certainty where the area of impact of the truck was and where Bergna landed when he exited or was thrown from the vehicle.  *Id.* at 25.  However, the jury heard extensive testimony that acknowledged that the actions of first responders rendering medical aid in the dark on a steep hillside may have made it difficult or impossible to later gather evidence about the crash.  The jury also heard extensive testimony regarding steps

police failed to take or ways they mishandled potential evidence during their investigation of the site, including dragging the camper shell back up the hillside, not taking certain measurements, and not noting the precise location of pieces of evidence (including the location of various parts of the truck at the scene). *See, e.g.*, Exh. 121, p. 44; Exh. 188, pp. 23-27; Exh. 183, pp. 181-182, 190; Exh. 118, pp. 31-32.

Testimony was also elicited that the truck remained where it landed out in the elements—including snow—for four days before it was moved. Exh. 117, p. 49. It was then stored outside at an impound lot for two and one-half years. Police also testified that the driver's side air bag was not removed and examined until two years after the crash. Exhs. 117, 121. Defense experts testified that they were unable to conduct thorough investigations (including of the brakes) because the inside and outside of the vehicle were not properly preserved. Exhs. 191, 175.

Bergna argues at length that the State failed to prove criminal agency due to, *inter alia*, the State's failure to gather and preserve evidence, pre-indictment delay, and that the State engaged in character assassination by introducing improper testimony of "other bad acts" (ECF No. 55, pp. 24-77). He also argues that the court improperly limited defense cross-examination and that there was extensive prosecutorial misconduct. *Id.* However, the analysis under *Jackson* is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. Under *Jackson*, a court reviewing an insufficiency of the evidence claim may not consider evidence that was not presented at trial. *Herrera v. Collins*, 506 U.S. 390, 402 (1993) ("*Jackson* is limited to 'record evidence . . .' [and] does not extend to nonrecord evidence, including newly discovered evidence."). The reviewing court "must consider all of the evidence admitted by the trial court, regardless of whether that evidence was admitted erroneously." *McDaniel v. Brown*, 588 U.S. 120, 131 (2010).

This court concludes that Bergna's claim that insufficient evidence supported the verdict lacks merit.   The court acknowledges that experts testified to different and sometimes conflicting opinions as to several of the details of how the crash occurred, including at what angle or trajectory the truck went down the hill, at what speed the truck was traveling, and the precise manner in which Bergna exited the vehicle.   Experts for the defense emphasized repeatedly that their attempts to test parts of the vehicle or to reconstruct events were hampered by the passage of time and the fact that the truck was stored outside for years.

However, the jury also heard:  expert testimony that the steering and brakes on the truck were functional, that Bergna could have avoided the crash by turning the steering wheel or applying the brakes, and that he was not in the truck when it went over the cliff. The State presented evidence that Bergna's baseball cap was found in the roadway, that no skid or yaw marks were found on the roadway, and that material consistent with asphalt was found on Bergna's clothing.

The State presented evidence that earlier that night Bergna had filled gas containers and they were open in the back of his truck, that Bergna was dressed in several layers of clothing, that he was not wearing his seatbelt and had rolled down his window. Testimony was also presented that Bergna's emotional reaction to his wife's death did not appear genuine, that he gave away Rinette's personal belongings soon after her death, and that he and Rinette had been having marital difficulties.   Finally, an inmate testified that Bergna admitted to him that he had killed his wife.  Specifically, the inmate testified that Bergna told him that Rinette was unconscious when he drove the truck off the road and that he had jumped out of the window.  Exh. 128, p. 126.

*Jackson* presents a high hurdle to be cleared to succeed on a sufficiency of the evidence claim.   443 U.S. at 319.   Bergna simply has not demonstrated that, after viewing the evidence in the light most favorable to the prosecution, *no* rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

Federal habeas relief is, therefore, denied as to ground 1.

　　**ii**. **Ground 3**

Bergna contends that his Fifth, Sixth and Fourteenth Amendment rights to a fair trial were violated because the district court denied his motion for change of venue and then denied his motion for use of a jury questionnaire during *voir dire* (ECF No. 55, pp. 80-85).

　　*Change of Venue*

With respect to change of venue, Bergna contends that due to extensive publicity and in particular because an episode of the television show "48 Hours" about his first trial was due to air shortly before jury selection was to begin for his second trial, the venue should have been changed from Reno to Las Vegas. *Id*. at 80-82. He asserts that in December 2001, during a teleconference with the court, the district court indicated that it was inclined to move the trial to Las Vegas. However, on January 7, 2002, the trial court issued a trial management order that stated that the venue would be Reno. *Id*.

The Sixth Amendment guarantees a defendant's right to a trial before an impartial jury. *Skilling v. U.S*., 561 U.S. 358, 377 (2010). The Constitution prescribes that trial shall take place in the state and district where the crime was committed. *Id*. at 377-378; Art. III, § 2, cl. 3; *see also* Amdt. 6. However, this does not prevent the transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a "basic requirement of due process." *Skilling*, 561 U.S. at 378 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

To support a change of venue request, the defendant must establish either presumed or actual prejudice. *See Skilling*, 561 U.S. at 367-68. The Supreme Court has explained that a court may presume prejudice only when the "trial atmosphere [is] utterly corrupted by press coverage," *Dobbert v. Florida*, 432 U.S. 282, 303 (1977) (citation omitted), or when "a wave of public passion . . . ma[kes] a fair trial unlikely by

15

the jury . . . ," *Patton v. Yount*, 467 U.S. 1025, 1040 (1984) (internal quotation marks omitted).   Juror exposure to news reports of a crime—even "pervasive, adverse publicity"—is not enough alone to trigger a presumption of prejudice to the defendant's due process rights.   *Skilling*, 130 S.Ct. at 384.   Instead, a presumption of prejudice "attends only the extreme case."   *Id.* at 381, 384 (describing the "vivid, unforgettable" and "blatantly prejudicial" information at issue in the handful of cases in which the Supreme Court has presumed prejudice as a result of pretrial publicity) (citing, *inter alia*, *Rideau v. Louisiana*, 373 U.S. 723 (1963) (20-minute video of defendant's confession to robbery and murder aired three times on television before his trial); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (""[B]edlam reigned at the courthouse during trial and newsmen took over practically the entire courtroom'. . . .Sheppard's case involved more than heated reporting pretrial: [the Supreme Court] upset the murder conviction because a 'carnival atmosphere' pervaded the trial.").

    In the alternative, a defendant may establish actual prejudice if, during *voir dire*, potential jurors who have been exposed to pretrial publicity express steadfast bias or hostility toward the defendant.   *Id.* at 386-87 & n.20 (citing *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991)).

    The court agrees with respondents that Bergna fails to demonstrate either presumed or actual prejudice.   He refers to an episode of a nationally-televised program, but he cites to no evidence of a saturation of prejudicial and inflammatory local media coverage (ECF No. 55, pp. 81-82).   The three news articles in the record can be readily distinguished from the media coverage in the cases discussed in *Skilling*.   Here, the local articles in the record report that Bergna claimed the crash was an accident, and the November 2001 Reno Gazette-Journal article in particular is about evenly split in discussing the prosecution and defense theories of the case.  Exhs. 265-3; 265-17.  The CBS News article "Mystery on Slide Mountain" post-dates the guilty verdict.  Exh. 265-8.

16

Bergna attempts to rely on the district court's comments prior to finalizing the pretrial order that the court was inclined to move the trial from Reno to Las Vegas (ECF No. 55, pp. 81-82). The record contains the affidavit of assistant district attorney Kelli Anne Bell. Exh. 265-11. Bell stated that before the district court issued its trial management order, the judge expressed in a teleconference with both sides that he had decided that due to media coverage and the 48 Hours television episode, the trial would be moved to Las Vegas. *Id.* However, that affidavit also recounts that the court agreed to entertain briefing on the change of venue. Subsequently, on January 7, 2002, after briefing by both parties, the district court issued its trial management order, which indicated that the trial would be conducted in Reno. Exh. 71.

Finally, respondents point out that the record reflects that the empaneled jurors either told the trial court during *voir dire* that they would be fair and impartial in their deliberations irrespective of any media exposure to the case, *see* exh. 109, p. 266 (Juror Wilson); *id.* at 71 (Juror Holt); *id.* at 70 (Juror Rudeen); *id.* at 34-35 (Juror Neil); *id.* at 55 (Juror Benjamin); *id.* at 69 (Juror Bohannon); exh. 110, p. 24 (Juror Abbott); or they told the court that they had not heard or read about the case, exh. 109, p. 146 (Juror Kiger); *id.* at 144 (Juror Ploumen); *id.* at 175 (Juror Casto); *id.* at 15 (Juror Hatten); exh. 110, p. 194 (Juror Jahan).

Bergna has failed to demonstrate presumed or actual prejudice by the trial court's failure to change the venue of the trial. *See Skilling*, 561 U.S. at 367-68.

*Jury Questionnaire*

Bergna also argues that his constitutional rights were violated because the trial court refused to use a jury questionnaire concerning juror exposure to media coverage of the case (ECF No. 59, pp. 82-85).

The trial court is to be given substantial deference with respect to conducting *voir dire* regarding pretrial publicity and juror bias. *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991). The Supreme Court has explained:

17

> Whether a trial court decides to put questions about the content of publicity to a potential juror or not, it must make the same decision at the end of the questioning: is this juror to be believed when he says he has not formed an opinion about the case? Questions about the content of the publicity to which jurors have been exposed might be helpful in assessing whether a juror is impartial. To be constitutionally compelled, however, it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair.

*Id.* at 425-426.  In that same case, the Court specifically observed that a potential disadvantage of the use of a jury questionnaire is that "such written answers would not give counsel or the court any exposure to the demeanor of the juror in the course of answering the content questions.  *Id.* at 425.

In denying Bergna's motion to allow use of jury questionnaire, the trial court explained that it had considered the parties' arguments, had (by stipulation) conferred with colleagues of the court regarding the utility of the proposed questionnaire, and had drafted and considered modifications, deletions and additions to the proposed questionnaire.  Exh. 83, p. 1.  The court concluded that it must rely on an evaluation of demeanor evidence as well as the content of answers and determined that in this particular instance, issues of pre-trial publicity and pre-formed opinions could be more meaningfully explored by in-person examination than by use of the proposed questionnaire.  *Id.* at 2 (citing *Mu'Min*, 500 U.S. 415).

Bergna has argued generally that a jury questionnaire was particularly important in this case (ECF No. 55, pp. 82-85).  He points out potentially prejudicial aspects of the 48 Hours episode.  He discusses at length the fact that several jurors learned during *voir dire* that the first trial ended with a hung jury.  *Id.* at 84-85.  This court notes that the fact that the first jury was unable to reach a verdict does not appear inherently prejudicial either against or in favor of Bergna or the prosecution.  In any event, Bergna has presented no compelling argument as to why the trial court's in-person examination of the potential jurors regarding pre-trial publicity and prejudice to Bergna is not entitled to deference.  Federal habeas relief is also denied as to the second part of ground 3.

18

Accordingly, the court denies federal habeas relief on ground 3.

### iii.  Ground 4

Bergna argues that the trial court's bias violated his Fifth, Sixth, and Fourteenth Amendment rights to due process, equal protection and a fair trial (ECF No. 55, pp. 86-99).  He asserts that the trial court manifested its bias against him by engaging in extensive cross-examination and impeachment of defense witnesses while "coddling and protecting" the State's witnesses, and by disparaging questions posed by defense counsel and imposing a fine on defense counsel in the presence of the jury.  *Id.*

The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge.  *See In re Murchison*, 349 U.S. 133, 136 (1955); *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 709 (9th Cir. 1989).  While a trial judge should strive to avoid the appearance of partiality, the Ninth Circuit has recognized that a judge is "more than an umpire."  *United States v. Laurins*, 857 F.2d 529, 537 (9th Cir. 1998). It is generally appropriate for a trial judge to participate in the examination of witnesses for purposes such as clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, or preventing undue repetition of testimony.  *United States v. Morgan*, 376 F.3d 1002, 1008 (9th Cir. 2004).  A trial judge's participation oversteps the bounds of propriety and deprives the parties of a fair trial only when the record discloses actual bias or leaves the reviewing court with an abiding impression that the judge's remarks and questioning projected to the jury an appearance of advocacy or partiality.  *See United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir. 2001).  However, "[e]ven in cases where a judge's participation in a trial is 'extreme,' that participation generally does not warrant reversal if a later curative instruction is given."  *Morgan*, 376 F.3d at 1008 (citing *Parker*, 241 F.3d at 1119).  In the context of federal habeas review, the question is not whether the state judge committed judicial misconduct, but whether the state judge's behavior "render[ed] the trial so fundamentally unfair as to violate federal due process under the United States

Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995) (emphasizing that a federal court "has no supervisory authority over criminal proceedings in a state court," and must only focus on whether the judge's actions, considered in the context of the trial as a whole, violated due process).

Bergna complains specifically about the trial court's questioning of five witnesses. Defense witness Jarvis Michie, a guardrail expert, testified as to several defects in the guardrail at the site of the crash and opined that the truck would have been stopped by a properly constructed and maintained guardrail at 30 mph at a 70-degree angle of impact to the guardrail.  Exh. 173, p. 13.  He also testified that the lack of reflectors on the guardrail made it very difficult for a driver to discern the correct path of travel and that there was a very wide shoulder there.  He testified that a driver could drift out of the lane, move over to the shoulder and be completely confused as to where he should be driving.  *Id.* at 9-10.

The court interposed a few questions; in particular, the court asked for clarification because to its recollection Michie had changed his testimony regarding the speed at which the truck hit the guardrail.  *Id.* at 109-118.  The court then admonished the jury before the next recess that the fact that the court asks questions of any witness does not indicate that the court has a particular view or opinion of the case at all.  *Id.* at 121. The court also questioned Michie as to whether and why Michie may have changed his testimony regarding the area of initial impact of the truck.  At that point, defense counsel asked for a recess and objected to that line of questioning as unfair, hostile and sarcastic.  *Id.* at 120, 122.  The prosecutor responded that he had observed defense counsel speaking with Michie just before Michie changed his testimony regarding the speed of the truck.  *Id.* at 125, 126-127.  Michie told the court that defense counsel "may have wanted me to expand into area outside my engagement" with respect to the truck's "impact with a guardrail," but stated that counsel had not asked him to change his opinions.  *Id.*

When defense counsel posed a particular question to State's expert Dr. Robert Turner, the court interjected, "well that's not fair he is trying to answer your questions." Exh. 133, pp. 13-14.   Bergna argues that Turner changed his testimony and contradicted himself as to how the blue paint was transferred from the truck onto the guardrail.   However, this court has reviewed the testimony and it is more fairly characterized as Turner clarifying his opinion as to how some of the paint was likely transferred.   Exh. 132, pp. 128-132.   Bergna asserts that the trial court did not impeach Turner as it allegedly had with some defense witnesses.   But defense counsel specifically questioned Turner as to whether he had changed his opinion and whether it was due to his conferring with the prosecution.   *Id.*

This court has reviewed the portions of the trial transcripts that Bergna insists reveal extreme bias of the court so as to deprive him of due process, including portions of the testimony of forensic scientist Kay Sweeney, exh. 139, pp. 221-231, exh. 166, pp. 150-151; engineer Lowell Howard Shifley, exh. 168, pp. 195-197; and mechanic Dewey Willie, exh. 121, pp. 110-119.   The court agrees with respondents that, especially when viewed in the context of a five-week criminal trial, these complaints do not demonstrate an "extremely high level of interference by the trial judge which creates a pervasive climate of partiality and unfairness." *Duckett*, 67 F.3d at 740.   The trial court also instructed the jury at the conclusion of the case that it was to disregard any suggestion of bias or favoritism, exh., 205, p. 4, and gave such a limiting instruction at other points in the proceedings. *See, e.g.*, exh. 168, pp. 195-197.   This court concludes that Bergna has failed to demonstrate extreme bias by the trial court that deprived him of due process.

Finally in ground 4, Bergna contends that his constitutional rights were violated because the trial court was critical in two instances of defense counsel's questioning of a witness and fined defense counsel in the presence of the jury (ECF No. 55, pp. 98-99).   Bergna also asserts that the court fined defense counsel three times and only fined

the prosecution twice.  *Id.*  Again, this was a five-week trial, and this court has reviewed the portions of the transcript that Bergna cites and finds no evidence of partiality.  Indeed, Bergna fails to even argue that the trial court's characterization of defense counsel's questions on two occasions as "petty" and "unfair" was inaccurate.  This portion of ground 4 is patently meritless.  Accordingly, federal habeas relief is denied as to ground 4 in its entirety.

### B.  Grounds 2, 7, 8, and 10

Next, the court considers claims that the Nevada Supreme Court rejected on direct appeal.

### i.  Ground 2

Bergna alleges that the trial court failed to admit defense evidence concerning defective Ford brakes in violation of his Fifth, Sixth and Fourteenth Amendment rights to due process and a fair trial (ECF No. 55, pp. 77-80).  The trial court refused to admit about five binders of documents from the Ford Motor Company that related to warranty complaints and repairs on the brake systems of Ford F-150 trucks.  *Id.* at 77.

The Constitution guarantees a criminal defendant a "meaningful opportunity to present a complete defense," and to introduce relevant evidence on his behalf.  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  However, this right is subject to reasonable restrictions "to accommodate other legitimate interests in the criminal trial process."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citations omitted).  Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury.  *See id; see also Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996).  The trial judge is entitled to broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate.  *Scheffer*, 523 U.S. at 308.  Even where the exclusion of evidence violates a defendant's constitutional rights, habeas relief is only appropriate if the excluded evidence had a "substantial and injurious effect" on the verdict.  *See Brecht v. Abrahamson*, 507 U.S 619, 637 (1993).

In denying this claim, the Nevada Supreme Court explained:

22

Bergna contends that the district court abused its discretion when it refused to admit approximately five binders of documents from the Ford Motor Company relating to warranty complaints and repairs on the brake systems of Ford F-150 trucks. Bergna asserts that, because his expert could not pinpoint the precise cause of the crash, a possibility exists that there were serious failures in two or three mechanical systems. Therefore, Bergna argues, consumer complaints relating to key brake components were relevant.

The decision to admit or exclude evidence rests within the sound discretion of the district court. Accordingly, absent a manifest abuse of that discretion, we will not overturn the district court's decision on appeal.

The district court permitted the defense's expert to testify as to his examination of the vehicle, his experience in the field, his opinion that additional tests were available to the State to test certain brake components and his reliance on Ford documents to form his opinion, but held that the Ford documents themselves were not admissible. The district court noted that during trial the defense failed to establish that the vacuum booster, the master cylinder and the RABS valve were defective, and therefore the Ford documents were irrelevant and would have likely confused the jury. The district court also determined that admitting the five binders of documents, which contained consumer complaints from around the country over the course of the years concerning various brake problems, would be unduly prejudicial to the State. Due to the voluminous appendix of documents, the district court examined four complaints chosen by the defense. The district court noted that the complaints from the other consumers differed from the complaints concerning Bergna's truck, in that the allegedly defective part, or combination of parts, were different. The district court concluded that Bergna's expert's testimony speculating that several brake components had failed did not warrant the introduction into evidence of unrelated consumer complaints concerning other Ford trucks. We agree. Accordingly, we conclude that the district court did not abuse its discretion when it refused to admit the Ford documents into evidence.

Exh. 254, pp. 21-22.

The trial court held that the documentation of other complaints related to the master cylinder or rear anti-lock braking system (RABS) was inadmissible. Exh. 166, pp. 129-131. The court reasoned that defense expert McCreary could testify as to his examination of the truck, his experience, and to the fact that no additional tests were done on the RABS valve and master cylinder, although the components were available to both parties for examination and testing. The court stated that McCreary could testify

as to whatever extent he relied on data from Ford Motor Company in forming his opinion as to the cause of the crash. *Id.*

The court explained that no evidence had been presented that the brakes failed or, if they failed, what caused the failure. *Id.* at 133-138. The court concluded that it would unfairly prejudice the State to admit hundreds and hundreds of pages of material that reflect a variety of brake problems reported by Ford consumers over the course of years. The court then went through the four exemplar complaints that the defense selected. The court noted that they were all different from each other and from the factual allegations in this case. *Id.*

As the Nevada Supreme Court pointed out, Bergna's expert was permitted to testify at length regarding his opinion that the brakes must have failed and he was permitted to refer to the Ford consumer brake complaints to the extent he relied on them. The Nevada Supreme Court's conclusion that the district court did not err in excluding as unfairly prejudicial and misleading volumes of Ford consumer complaints that differed significantly from each other and from the defense's theory that brake failure caused the crash simply cannot be said to be unreasonable. Bergna has not shown that the Nevada Supreme Court's decision on federal ground 2 is contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Accordingly, ground 2 is denied.

### ii. Ground 7

Bergna alleges that the trial court erred in failing to dismiss the indictment based upon the State's destruction of exculpatory evidence in violation of his Fifth, Sixth and Fourteenth Amendment rights to due process and a fair trial (ECF No. 55, pp. 146-148).

The State's loss or destruction of potentially exculpatory evidence violates due process only when the evidence "possess[es] an exculpatory value that was apparent

24

before the evidence was [lost or] destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984); *see also United States v. Bingham*, 653 F.3d 983, 994 (9th Cir. 2011).  However, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *see also Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004) (*per curiam*).  "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n. *; *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013).  Even negligence in failing to preserve potentially useful evidence is not sufficient to constitute bad faith and does not violate due process.  *Youngblood*, 488 U.S. at 58; *see also United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) ("Bad faith requires more than mere negligence or recklessness.").

The Nevada Supreme Court rejected Bergna's claim that the district court's failure to dismiss the indictment based upon the State's failure to preserve the truck's airbag and cornstarch, a guardrail post that the truck struck, the truck's master cylinder, and failure to store the truck in a manner that would have preserved its condition.  The state supreme court explained (headings added):

> Airbag
>
> Bergna contends that the district court abused its discretion when it failed to dismiss the indictment upon learning that the airbag and cornstarch granules had not been preserved.  Bergna first contends that, if the State had removed the airbag from the vehicle on the day of the incident, the airbag would be in testable condition.  Bergna, however, fails to explain how he would have tested the airbag or what he expected the test results to reveal or how this evidence would have been exculpatory. Bergna seems to argue that preservation of the airbag would have demonstrated that the cornstarch particles found on Bergna's jacket were from the airbag, thereby placing him in the vehicle at the moment of

25

impact, supporting Bergna's theory that he was ejected from the vehicle after it hit the guardrail.  However, because experts testified that it is impossible to determine the source of a particular cornstarch granule, testing of the cornstarch particles would support neither the State's nor the defense's theory.  NHP's first concern upon arrival at the crash site was the safety of those involved in the accident rather than contamination of evidence.  As standard procedure, rescue and emergency personnel wore latex gloves, which typically are dusted on the inside with cornstarch.  Consequently, the cornstarch particles found on Bergna's clothing could just as easily have come from the latex gloves.  Therefore, Bergna failed to demonstrate that the State should have reasonably anticipated that the airbag would have been material, exculpatory evidence.  Accordingly, we conclude that Bergna's argument is without merit.

Guardrail Post

Next, Bergna contends that, because the State destroyed guardrail post 108, the district court should have dismissed the indictment.  Bergna argues that the State's failure to preserve the evidence and immediately investigate the evidence after the crash prejudiced his right to a fair trial.  The State's expert testified that he did not conduct any tests on the wood because the pieces of wood found in the truck's undercarriage, which were presumably from post 108, were irrelevant to the determination of the speed of the truck or the approaching angle.  Indeed, even assuming that the pieces of wood were from post 108, Bergna does not explain how this evidence is material or exculpatory or how it would support his theory of the case.  The defense's expert testified that the pieces of wood found in the truck's undercarriage were not natural growth and were treated with chemicals.  The State did not dispute this testimony.  The defense also did not attempt to compare the pieces of wood with the other existing posts.  Even had the State had preserved post 108, there is no indication that the evidence would have been exculpatory.

Master Cylinder

Finally, Bergna contends that, because the State failed to preserve the vehicle's master cylinder, the district court should have dismissed the indictment.  Bergna first argues that the State knew from the date of the incident that a murder investigation was realistically in the future, and therefore, should have preserved the truck.  Bergna also argues that the State was on notice that the brakes on Bergna's vehicle were defective and, therefore, should have preserved the braking system.  Yet, during Bergna's first trial in October 2001, the defense did not argue that the brakes on the truck were defective.  It was not until March 2002 that the defense attempted to investigate and examine the truck.  Moreover, the State's examination of the vehicle in June 1998 did not reveal the presence or possibility of brake failure.  Accordingly, the record does not

26

support Bergna's contention that the State knew of any existing or possible brake problems.

Bergna argues that the presence of brake fluid on the surface of the vacuum booster warrants the inference that the mast cylinder seal had been leaking. The State's expert testified that, if the master cylinder were defective, investigators would have found fluids on the roadway, which they did not. Crime scene investigators testified that there were no fluids found on the roadway nor any other evidence that the master cylinder had leaked. Furthermore, Bergna's expert was unable to determine whether the hypothetical leak occurred pre-crash or post-crash. Bergna's expert testified that, due to the master cylinder's deteriorated condition in March 2002, there was no way to test it. However, the State's expert testified that the rust, dirt and corrosion on the master cylinder could have resulted from the vehicle tumbling 800 feet down the hillside, its four-day stay there through rain and snow, its helicopter flight with the attendant wind and dust, its transport to the impound lot and, finally, the deteriorating effects of time over four years. Experts testified that dry air causes deterioration to rubber, and that, even if the vehicle had been covered or kept indoors, simply through the passage of time, the rubber seal on the master cylinder could have easily deteriorated. These circumstances were unavoidable. Therefore, even if the State had taken additional measures to preserve the master cylinder, Bergna has failed to show how the master cylinder would have been material or exculpatory to his defense. Accordingly, Bergna's argument is without merit.

Exh. 254, pp. 14-17.

Due process is not implicated unless a defendant can show that police acted in bad faith by failing to preserve what they knew at that time was potentially exculpatory evidence. *Youngblood*, 488 U.S. at 58. With respect to the preservation of the airbag and the guardrail post, Bergna fails to even allege that police knew that those items were potentially exculpatory evidence. Moreover, he acknowledges that police negligently discarded the guardrail post, and such negligence does not violate due process. With respect to the preservation of the master cylinder, Bergna does not explain how deterioration that occurs over time could have been avoided. While he argues that the State admitted it viewed the crash as suspicious from the beginning, he does not even allege, much less demonstrate, that police acted in bad faith and failed to preserve the master cylinder despite knowing that it was potentially exculpatory evidence.

27

Bergna has failed to demonstrate that the Nevada Supreme Court's decision on federal ground 7 is contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Accordingly, this court denies habeas relief as to ground 7.

### iii.  Ground 8

Bergna contends that the trial court's failure to give certain jury instructions violated his Fifth, Sixth and Fourteenth Amendment rights to due process  and   a   fair trial (ECF No. 55, pp. 148-151).

To obtain relief based on an error in instructing the jury, a habeas petitioner must show the "'instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Where the defect is the failure to give an instruction, the inquiry is the same, but the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law.  *See Henderson v. Kibbe*, 431 U.S. 145, 155-157 (1977); *see also Estelle*, 502 U.S. at 72.

With respect to spoliation of evidence, the defense proffered the following instruction:

> To establish a violation of due process resulting from the State's loss of or destruction of evidence, a defendant must demonstrate either (1) that the state lost or destroyed the evidence in bad faith, or (2) that the loss unduly prejudiced the defendant's case and the evidence possessed an exculpatory value that was apparent before the evidence was destroyed.
>
> Such loss or destruction of the evidence by the State establishes a rebuttable presumption that had evidence been available for testing and use, the evidence would have established the existence of facts consistent with defense claims relating to such evidence.

Exh. 194.

With respect to proximate cause, the defense proffered the following instruction:

> The State must prove beyond a reasonable doubt that the defendant's act was the proximate cause of death.  The proximate cause of death is that cause which in a natural and unbroken sequence produces death.

Exh. 195.

The Nevada Supreme Court rejected Bergna's claim that the trial court erred by failing to issue those instructions.  The state supreme court reasoned as follows:

> Although a defendant has a right to have the jury instructed on his theory of defense, his theory must be supported by at least some evidence.  *Vallery v. State*, 46 P.3d 66, 76-77 (Nev. 2002).  Determining the appropriateness of a jury instruction is within the sound discretion of the district court.  *Jackson v. State*, 17 P.3d 998, 1000 (Nev. 2001).  Accordingly, we "will review a district court's decision to give a particular instruction for an abuse of discretion or judicial error." *Id.*

> Bergna first contends that, if this court determines that Bergna's due process rights were violated by the State's failure to preserve evidence, then the district court abused its discretion when it refused to give to the jury Bergna's proffered spoliation of evidence instruction.  We conclude that, because the evidence does not support a spoliation of evidence theory, the district court did not abuse its discretion when it refused to submit the spoliation of evidence instruction to the jury.

> Bergna next contends that the district court abused its discretion when it refused to submit his proffered jury instruction on proximate cause . . . .
> Here, there is no evidence that the Nevada Department of Transportation's allegedly poor maintenance of the guardrail system on Slide Mountain was the sole cause of Rinette's death, as would be required in order to relieve Bergna from criminal liability.  Instead, the evidence indicates that Bergna's intentional act of driving the vehicle into the guardrail was a substantial factor in Rinette's death.  Expert testimony also suggested that, even if the guardrail had been in prime condition, it was only designed to protect against low-angle collisions.  Moreover, the jury received several instructions on the State's burden to prove the elements of the crime beyond a reasonable doubt.  Because there is no evidence indicating that NDOT's actions constituted a superseding cause, we conclude that the district court did not abuse its discretion when it refused to give the jury Bergna's proffered proximate cause instruction.

Exh. 254, pp. 18-20.

As discussed above in relation to ground 7, Bergna's claim premised upon the State's destruction of exculpatory evidence failed because Bergna did not establish that police acted with bad faith and destroyed evidence that they knew was potentially exculpatory.   As such, Bergna cannot show that the Nevada Supreme Court's conclusion that the evidence did not support his spoliation theory was contrary to or an unreasonable application of clearly established U.S. Supreme Court law. Consequently, Bergna cannot demonstrate that the Nevada Supreme Court's conclusion that the trial court did not err in refusing to give the spoliation jury instruction was contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   28 U.S.C. § 2254(d).

Regarding the proximate cause instruction, the Nevada Supreme Court pointed out that no evidence was presented that any failure to maintain the guardrail was the single cause of Rinette's death.   As discussed above as to ground 1, the jury evaluated proffered evidence suggesting that Bergna intentionally drove the truck over the cliff as well as expert testimony that speculated that the brakes likely malfunctioned.   No evidence was presented that any failure of the guardrail was a superseding cause of death, the question for the jury was whether Bergna acted intentionally or accidently lost control of the truck.   Therefore, Bergna fails to demonstrate that the Nevada Supreme Court's conclusion that the trial court did not err in refusing to give the proximate cause jury instruction was contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   28 U.S.C. § 2254(d).   Federal habeas relief is denied as to ground 8.

### iv. Ground 10

Bergna asserts that the trial court erred in failing to dismiss the indictment following the improper admission of prejudicial character and prior bad act testimony, in violation of his Fifth, Sixth and Fourteenth Amendment rights to due process and a fair trial (ECF No. 55, p. 151-153).

On federal habeas review, a district court may not re-examine state-court decisions on state-law questions, but is limited to inquiring whether a conviction violated the Constitution or federal law. *Estelle v. McGuire*, 502 U.S. at 68.   In Nevada, a grand jury "can receive none but legal evidence, and the best evidence in degree, to the exclusion of hearsay or secondary evidence." NRS 172.135(2).

In rejecting this claim, the Nevada Supreme Court explained:

> Bergna argues that testimony from several witnesses at the grand jury proceedings was inadmissible bad act evidence.  As discussed [earlier in this order], we conclude that the bad act testimony was relevant, probative of motive and necessary to rebut Bergna's character witnesses, and that the opinion testimony concerning Bergna's grief was admissible pursuant to NRS 50.265.

> Bergna also contends that the grand jury should not have heard testimony from Trooper John Schilling referencing the findings of Sye Linowitz, an engineer from Ford Motor Company, without also hearing Linowitz's initial, erroneous findings concerning the airbag.  A pretrial hearing indicated that Linowitz's report contained error concerning speed and distance and, therefore, the timing of the airbag deployment.  However, while Trooper Schilling's grand jury testimony refers to Linowitz's reports, Schilling did not make any direct statement about the results from Linowitz's report.  Instead, Trooper Schilling simply testified that he was aware that Linowitz was investigating the crash.  Therefore, we conclude that the reference to Linowitz having investigated the crash was harmless and did not require the submission of his initial erroneous report to the grand jury or dismissal of the indictment.  Accordingly, Bergna's argument is without merit.

> Bergna also contends that the submission to the grand jury of Bergna's entire, unredacted statement, which included reference to a polygraph test, prejudiced Bergna.  A copy of Bergna's statement was not included in the record on appeal.  The State summarized that the remark concerning the polygraph was brief, that the results of the test were never discussed and that the State never used the information against Bergna.

31

The State asserts that the statement revealed only that officers requested Bergna take a polygraph, that he agreed to take the test and that he had never taken the test before.  Bergna does not dispute this assertion.

In the absence of a written stipulation from both parties, the results of a polygraph test are inadmissible.  Furthermore, evidence "that a defendant in a criminal trial either refused to take a polygraph test or offered to submit to one is inadmissible and incompetent evidence." Because there is nothing in the record on appeal that the statement included either a refusal or an offer by Bergna to take the polygraph test or that the statement included polygraph test results, Bergna's argument is without merit.

Finally, Bergna has not demonstrated that the alleged errors in the grand jury proceeding prejudiced his right to a fair trial.  Even if Bergna's contentions regarding the inadmissibility of certain evidence before the grand jury may have merit, sufficient evidence existed to support the grand jury's determination and the subsequent indictment, including, but not limited to: (1) a baseball hat found on the roadway several feet in front of the guardrail, while Bergna was found 80 feet down the hillside and allegedly ejected out of the window after hitting the guardrail; (2) testimony that the passenger airbag was turned off; (3) expert conclusions that Bergna was not in the vehicle when it went over the guardrail and that Bergna could not have been realistically ejected from the vehicle; (4) lack of evidence of any attempt to stop the vehicle from crashing through the guardrail; (5) lack of evidence indicating that the vehicle was out of control; (6) lack of evidence demonstrating that brake fluid had leaked or that the steering or braking systems were defective; (7) testimony that the roadway near the crash was not overly steep; (8) a reenactment test indicating that a simple turn could have prevented the vehicle from crashing into the guardrail; (9) the condition of the roadway, which banked to the left, and not to the right, where the guardrail was located; (10) expert conclusions that damage to Bergna's shoes was more consistent with dragging on the roadway than rolling down the hillside; (11) lack of visible signs of trauma or torn clothing on Bergna; and (12) the presence of two gasoline cans in a dangerous condition in the back of Bergna's vehicle, which were purchased just prior to Bergna picking the victim up from the airport.  Accordingly, we conclude that the district court did not err when it refused to dismiss the indictment.

Exh. 254, pp. 10-13.

Testimony that Bergna's emotional response did not seem genuine, that he asked someone out on a date a month before his wife's death and about the snowblower incident was discussed above with respect to federal ground 1.   Bergna has not

32

demonstrated that the Nevada Supreme Court was unreasonable in deeming that such bad act testimony was relevant, probative of motive and necessary to rebut Bergna's character witnesses, and that the opinion testimony concerning Bergna's grief was admissible pursuant to NRS 50.265.  Further, as the state supreme court pointed out, testimony referencing Sye Linowitz's testing of the airbag merely stated that Linowitz conducted tests, which were inconclusive.  Exh. 3, p. 76.

It is also clear that the Nevada Supreme Court's detailed conclusion that, in any event, sufficient evidence supported the grand jury's determination and subsequent indictment, as outlined above, cannot be said to be unreasonable.

Bergna has not demonstrated that the Nevada Supreme Court's conclusion that the trial court did not err in when it did not dismiss the indictment following the admission of character and prior bad act testimony, was contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Federal habeas relief is denied as to ground 10.

### C.  Ineffective Assistance of Counsel (IAC) Claims

Bergna alleges numerous instances of ineffective assistance of trial counsel in ground 5, and of appellate counsel in ground 6, which he argues violated his Fifth, Sixth and Fourteenth Amendment rights (ECF No. 55, pp. 99-125).

Ineffective assistance of counsel claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the

deficient performance prejudiced the defense. *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000) (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id*. To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id*. Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id*.

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*.

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id*. at 1403 (internal citations omitted). Moreover, federal habeas review of an ineffective

assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits.  *Cullen*, 563 U.S. at 181-84.  The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at ——, 129 S.Ct. at 1420.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at ——, 129 S.Ct. at 1420.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105.  "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689).  "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom."  *Id.* (internal quotations and citations omitted).

### i.  Ground 5

The Nevada Supreme Court summarily affirmed the denial many of the ineffective assistance of trial counsel claims that Bergna raises here on the basis that he failed to demonstrate prejudice.  Exh. 297.  When the last state-court decision is a summary denial on the merits, the "unreasonable application" clause requires that a federal habeas court look to the last reasoned state-court opinion in determining whether the state court's rejection of the claims was contrary to or an unreasonable application of clearly established federal law under 28 U.S.C. section 2254(d)(1).  *See Johnson v. Williams*, 133 S.Ct. 1088, 1094 n.1 (2013) (citing *Ylst v. Nunnemaker*, 501 U.S. 797 (1991)).

**Ground 5(A)**

Bergna alleges that trial counsel was ineffective because they presented a defense theme to the jury based on evidence of faulty brakes, blue paint and bad faith by Ford Motor Corporation and the Hartford Insurance Company, before the court ruled on the admissibility of evidence of consumer complaints about Ford brakes.  The court later ruled that such evidence was inadmissible.  The state district court reviewed this claim in detail:

> Bergna alleged that David Schwartz, in delivering the opening statement, made "specific promises about what the evidence at trial would reveal," but then adds that "the vast majority of the evidence supporting the defense opening statement was not actually presented at trial," including, but not limited to, the expected appearance and testimony from Alan Assay and Sye Linovitz, two people found on the State's witness list, who would ultimately not testify at trial, and Schwartz's single reference to "Ford documents," which were offered but not admitted at trial. Accordingly, counsel was ineffective. The Court disagrees.

> First, assuming we are actually dealing with a promise, the Court is skeptical about whether making a promise in an opening statement in the guilty phase of a murder trial that goes unfulfilled amounts to ineffective assistance under *Strickland*.  Bergna did not present any evidence establishing that, by mentioning items of information in an opening that were, ultimately, never offered or admitted, is objectively unreasonable under a prevailing professional norm. This is clear failure of proof.

> Nevertheless, assuming reasonably competent trial lawyers may not make promises and then not fulfill them, the Court has read the comments at issue in the context of the entire opening statement, and after reading those comments in conjunction with Schwartz's testimony here, the Court finds that Schwartz made no promises.  Hence, counsel was not ineffective in delivering his opening statement in the manner he delivered it.

> But even assuming that, by mentioning the two points identified by Bergna, Schwartz's presentation constituted an unreasonable act under *Strickland*, Bergna was not prejudiced by it.

> First, the Court finds that the jury was told that counsel's comments are not evidence, and that it must base its verdict on the evidence presented.  The jury is presumed to have followed that instruction.  Bergna presented no evidence rebutting or tending to rebut that presumption.

36

Second, the Court finds that Bergna presented no evidence that the jury attached any significance to any part of Schwartz's opening statement, let alone the two parts at issue here. Moreover, while the Court is mindful that the jury appeared to be taking notes during Schwartz's opening statement, Bergna presenting no evidence proving or tending to prove what these jurors found noteworthy.

Third, the Court finds that nearly one entire month passed between the delivery of the opening statement and the point at which the defense rested. In the meantime, defense counsel were able to pick away at the State's experts and present experts of their own, regardless of the items that were presented in the guilt phase of the trial.

Fourth, the Court finds that Schwartz's error did not in any way undermine the primary defense: namely, that Bergna, a man of long standing good character, with no motive to kill his wife, had been involved in a tragic accident, which ended the life of a woman he loved and who loved him.

Fifth, the Court notes that this is not a case in which the Ford documents and/or Linovitz and Assay were never mentioned again by the defense. The Court therefore finds that, in large part, the "promises" made in opening statement, if that is what they were, were fulfilled. In fact, the Court ruled that McCreary, the defense's brake expert, could rely on those documents in expressing his opinions about bad brakes. Later, when McCreary testified, and after he had detailed his opinions regarding the problems with Bergna's brakes, and the inadequacy of the State's examination of the brakes, he did not "find it unusual that Bergna's Ford F-150 developed a brake defect." Consequently, to whatever extent Schwartz made a "promise" involving Ford documents, it was fulfilled by McCreary.

Insofar as Linovitz and Assay are concerned, the Court finds that their absence from trial could not have undermined Bergna's primary defense. First, when Schwartz commented on these two men, along with their apparent bias to their respective employers—Ford and Hartford—and their animus to Bergna, Schwartz also stated they were State witnesses. The Court believes it more likely that the jury here was not wondering why the defense failed to call the biased State experts but understanding why the State didn't.

In sum, Bergna failed to prove, by a preponderance of evidence, that he was deprived of his right to the effective assistance due to the content of the opening statement. He also failed to demonstrate prejudice.

Exh. 283, pp. 3-5.  The state district court's decision is eminently reasonable; Bergna has failed to demonstrate that the Nevada courts unreasonably applied *Strickland*.

**Ground 5(B)**

Bergna argues that trial counsel were ineffective because they opened the door to highly prejudicial testimony by his ex-wife (ECF No. 55, pp. 105-106). He contends that he and his former wife had not been in contact for over a decade, and therefore, reasonably effective counsel would have limited their questions of Bergna's character witnesses, his sister and a friend, to the ten years prior to Rinette's death.  *Id.*

The Nevada Supreme Court affirmed the denial of this claim, reasoning that trial counsel made a tactical decision.  Exh. 297, p. 3.  The state supreme court explained that "Trial counsel testified at the evidentiary hearing that based on the State's case, they needed to negate or diminish any inference that appellant had bad character.  *Id.*

Defense counsel Smith testified at the postconviction evidentiary hearing that he did not want to put on any character witnesses because he thought they distracted from the main theme of the defense that this was an accident.  Exh. 277, pp. 63-64. However, defense counsel Puentes testified that, after the State's case-in-chief:

> I felt that we were in a lot of trouble . . . . at that point Peter was a very unlikable character, and I think we needed to rehabilitate him, so my thought is that we didn't open the door, we were simply rebutting what was – what was said on direct examination and we needed to do something to rehabilitate our client.

*Id.* at 14.  Puentes testified that, as a practical matter, he did not see how they would have limited the testimony of Bergna's sister and his friend to only the last ten years and that the defense wanted those witnesses to testify to Bergna's longstanding good character.  *Id.* at 14-15.

Defense counsel Schwartz testified that he was the lead lawyer on the case and that, while the three lawyers worked as a team, if a decision had to be made, he would be the one to make it.  Exh. 299, p. 5.  He also testified that he saw no reasonable way

38

to ask a friend of Bergna, who had known Bergna for 25 years, to limit his testimony to the last 10 years. *Id.* at 11-12. He noted that that would be a red flag for the jury, who would likely wonder what testimony the defense was trying to avoid. *Id.* at 12. Schwartz testified that he believed the defense had absolutely no choice but to put on character witnesses to try to rehabilitate the jury's view of Bergna. *Id.* at 13-14. He had no recollection of counsel Smith disagreeing about presenting character witnesses. *Id.* Schwartz also stated that Bergna was adamant that the defense call these witnesses and that he agreed with Bergna. *Id.* at 14-15.

The state district court held:

> First, it is clear that a very important element of the overall defense case was Bergna's good character, *i.e.*, not only did he not murder his wife, he is simply not the sort of person who would harm his wife, and Bergna does not quarrel with the general proposition that advancing a character defense in this case was reasonable. Indeed, at Bergna's request, the Court gave an instruction on the subject and effect of good character in relation to reasonable doubt. *See* Instruction 31.

> In addition, the defense, quite understandably, was interested in negating or diminishing any inference that Bergna may have bad character. The Court agrees. But where counsel went astray, according to Bergna, was presenting the various character witnesses in such a way that Ms. Tillery could testify as a rebuttal witness. Reasonable counsel, Bergna alleged, "would have instead limited their evidence about Mr. Bergna to the 10 years prior to Ms. Riella-Bergna's death."

> To prevail on this claim of ineffective assistance, Bergna had to prove that presenting character evidence dating back over ten years prior to his wife's death was unreasonable under a prevailing professional norm. He presented no such evidence from any source.

> The Court is, of course, mindful that Mr. Smith had some misgivings about putting on a character defense, but Schwartz testified he had no recollection of Smith having any misgivings. The Court believes Schwartz's version is true.

> Moreover, according to Schwartz, Bergna was "adamant" that they call these character witnesses. In addition, the fact of the matter is that Bergna's old friends knew him best, and they were his better character witnesses.

39

Furthermore, Schwartz credibly testified that he did not consider limiting the witnesses to a particular time frame; he believed, and reasonably so, that the defense had to give the jury a reason to like Peter Bergna, and he did not believe calling a witness like Mr. Sampson, for example, who had known Bergna for 25 years and having him limit himself to the past 10 years was the way to go about it. Again, Bergna failed to prove this strategy was unreasonable, particularly where, as here, a significant part of Bergna's adult life would be left out.

In sum, the Court finds that, even if the scope of the character defense opened the door to Ms. Tillery, the Court finds the overall strategy, which included a character defense, was reasonable, and certainly not shown to have been substandard in this case.

Exh. 283, pp. 5-7. Bergna argues here that without his former wife's testimony there is a reasonable probability that the jury would not have returned a guilty verdict (ECF No. 55, p. 106). This conclusory statement does not serve to carry his burden under *Strickland*, and he has not demonstrated that the Nevada Supreme Court unreasonably applied *Strickland*.

### Ground 5(C)

Bergna contends that trial counsel were ineffective when they failed to object to inadmissible evidence of State's witness inmate Darrell Coursey's religious beliefs (ECF No. 55, pp. 106-109). Bergna argues that the improper questions had no evidentiary purpose other than bolstering the witness' credibility.

The Nevada Supreme Court summarily affirmed the denial of this claim on the basis that Bergna did not show prejudice. Exh. 297, p. 2.

Defense counsel Puentes testified at the state postconviction evidentiary hearing that he thought Coursey's testimony was "incredulous," that he did not think he was a good witness for the State and that the defense team was not overly concerned that Coursey was going to make a big difference in the case. Exh. 277, p. 15.

Defense counsel Schwartz testified that he was personally skeptical in general about jailhouse religious conversions and jailhouse confessions and that he attempted to demonstrate on cross-examination that Coursey was not a credible witness. Exh. 299, pp. 16-17.

The state district court denied the claim, reasoning:

> Under direct examination by the prosecutor, Darrell Coursey, a jailhouse informant, testified that Bergna confessed to him. In doing so, Coursey also mentioned his religious beliefs and his efforts "to practice the things that the faith teaches [him]."

> Bergna alleged . . . that trial counsel was ineffective in failing to file a motion in limine prohibiting this sort of improper examination, or by otherwise failing to object when it was tendered.

> . . .

> A witness's religious beliefs are "inadmissible for the purpose of showing that by reason of their nature his credibility is impaired or enhanced. NRS 50.105. But here, the Court is not persuaded, from the trial record, that Coursey's testimony, in context, was offered to enhance credibility.

> For example, Coursey was not asked about any relationship between the command against bearing false witness and his version of his encounter with Bergna. Rather, the Court believes that Coursey's religious conversion is what inspired him to attend Bible Studies, and it was after one such meeting, a meeting Bergna attended, that he and Bergna had their conversation. Later, Coursey was asked about who he had talked to about coming forward and testifying. In response, Coursey named his girlfriend and his pastor. This exchange, central to Bergna's allegations, does not inculcate the Commandment.

> Assuming Coursey's references to his religion approached the line warranting an objection, Schwartz, without contradiction or impeachment, explained why he did not object, detailing his skepticism with the religious conversions of jailhouse informants generally, and with the notion that simply asking a jailhouse "snitch" about his religious beliefs is actually bolstering his credibility specifically. The Court finds this testimony to be credible.

> Schwartz was, of course, quizzed about whether the jury had the benefit of his experience, and Schwartz made it clear that he had anticipated Coursey's testimony, and was ready to show, on cross, that the jury would share his skepticism, and conclude, as he did, that Coursey was a snitch "out to feather his own nest." Given Schwartz's credible testimony, the Court finds that he had a good idea that Coursey might mention something of his religion, but, based on his experience, Schwartz was skeptical of such religious conversions by jailhouse informers, particularly ones like Coursey who had a criminal record and conveyed that skepticism to the jury through his examination. Consequently,

Schwartz did not object when Coursey started talking about his faith. Instead, Schwartz preferred to impeach Coursey, who appeared slovenly, shifty and not very credible, and then establish, ultimately, that Coursey's entire account was contrived. This strategy, under *Strickland*, is presumed reasonable, and, taken from Schwartz's perspective at the time, was in fact reasonable. Bergna presented no evidence drawing that conclusion into question.

Exh. 283, pp. 7-9. Bergna presents nothing here to demonstrate that the Nevada courts unreasonably applied *Strickland*.

### Ground 5(D)

Bergna argues that trial counsel failed to fully impeach Darrell Coursey with evidence that he was being treated with psychological medication, that he had newspaper clippings in his cell, that he had lied to the court in another case and that he received a "tremendous benefit" for testifying in this case (ECF No. 55, pp. 110-112). The Nevada Supreme Court summarily affirmed the denial of this claim. Exh. 297, p. 2.

Defense counsel Schwartz testified at the state postconviction evidentiary hearing that he was aware that Coursey was on psychiatric medication and that, as he recalled "they were for a mood disorder, as opposed to a broad disorder." Exh. 299, pp. 18-19. He stated that the defense considered presenting evidence that newspaper clippings were confiscated from Coursey's cell in order to further their theory that Coursey fabricated the confession based on news articles about the case, but they were unable to ascertain what the clippings were and what specific information Coursey may have learned. *Id.* at 19-20. Schwartz testified that he believed Coursey was an ineffective witness—Coursey looked unkempt and did not make eye contact—and that he succeeded on cross-examination in highlighting Coursey's lack of credibility. *Id.* at 22-24.

In denying this claim, the state district court reasoned:

> Since Coursey was the only witness to whom Bergna confessed, or to who he is alleged to have confessed, Bergna claimed that defense counsel could have and should have done a better job of impeaching him. This claim was not proven.

42

a. Impeachment with Medical History

First, Bergna alleged that defense counsel should have learned that Coursey "had been receiving psychological medication while at the Washoe County Detention Center," and then secured production of Coursey's medical file. Once that was accomplished, defense counsel could determine what types of drugs Coursey was on when he spoke to Bergna and then determine if Coursey could be impeached based on his psychological condition. Schwartz testified credibly that he was aware that Coursey had been using medication, and it was for a mood disorder. Schwartz did not know the names of the medications, however. Unfortunately, Bergna did not establish just exactly what medications Coursey was using, nor did he establish the dosages. Certainly, proving those facts was part of Bergna's burden of proof here. Presumably, Bergna believes that information existed somewhere, and a reasonably effective trial lawyer would have conducted an investigation designed to learn that information. Again, Bergna did not present any evidence proving or tending to prove that a reasonably competent lawyer would have conducted such an investigation, but more importantly, he failed to establish what such an investigation would have in fact revealed.

In sum, Bergna presented no evidence establishing what medications Coursey was using, the dosages, or the effects, if any, from using them. Consequently, there was no effort made in the present proceeding to show what information a reasonably competent trial lawyer would have used to impeach Coursey, nor did Bergna prove that Coursey would have been impeached. In short, the Court finds a double failure of proof under *Strickland*.

b. Impeachment with Newspaper Clippings

Bergna also alleged that trial counsel should have investigated and learned that Coursey had newspaper clippings in his cell. Had counsel done so, Bergna alleged counsel could have argued that Bergna did not confess after all; instead, Coursey merely testified about what he learned from reading the clippings. This claim also suffers from failure of proof.

First, defense counsel testified credibly that he was aware of the clippings, but, upon investigation, could not pin it down: "We could not establish that the newspaper clippings were . . . we could produce no independent testimony about what the newspapers or what specific information he obtained from newspapers." The Court therefore finds that, while counsel was aware of the newspaper clippings, counsel could not pin down just exactly what the clippings involved. Consequently, the Court finds that the matter of newspaper clippings was investigated, and that the scope of the investigation was reasonably complete. Furthermore, since the actual clippings were not produced in the present proceeding and no

one testified about the content of the clippings, Bergna also failed to demonstrate prejudice.

### c. Impeachment with "Tremendous Benefits" for Testifying

Bergna also alleged Coursey could have been impeached "with evidence demonstrating that he received tremendous benefits for testifying in another case because he was eligible for adjudication of habitual criminal, but the State did not seek this enhancement against him." Bergna offered no evidence proving or tending to prove that these "tremendous benefits" existed. In other words, the Court finds that, given the trial record and that of the evidentiary hearing, there simply was no deal for Coursey's testimony and Bergna failed to prove there was.

Moreover, the trial record shows that Schwartz examined Coursey extensively on his criminal record, plea deals, sealed transcripts, and the aborted effort to withdraw a plea. In addition, Schwartz got Coursey to concede he "attempt[ed] to cooperate . . . to assist yourself as well as to assist law enforcement" on a variety of occasions and that Coursey may have expected benefits here. Schwartz even asked about the other case alluded to in Bergna's pleadings: namely, the Mr. O's murder, and a potential drug charge arising while Coursey was in jail. Moreover, the Court gave a limiting instruction addressing Coursey explicitly, and Schwartz crafted an elegant argument around that instruction.

In short, the record shows, despite Bergna's allegation to the contrary, that Schwartz made every reasonable effort to impeach Coursey. Whether another viable line of impeachment evidence could have been adduced about habitual criminal adjudications, assuming the Court could plumb the depths of the applicability of that enhancement to Coursey, Bergna failed to prove Schwartz's failure to pursue it, along with or in contrast to his extensive effort to impeach Coursey, was unreasonable in this case. The Court also finds that the potential of a habitual criminal adjudication, even if viable, would not have added any more weight to the tendered effort to impeach Coursey already delivered by trial counsel.

. . . .

### e. Impeachment with Other Jailhouse Informants

Next, Bergna contends that, once defense counsel learned the State intended to use Coursey, a jailhouse snitch, to testify about a confession, they should have conducted an investigation that could have led to the discovery of other inmates who might impeach Coursey and his version of the facts and details of his conversation with Bergna.

First, Bergna failed to prove that a reasonable lawyer would have conducted that investigation. He also failed to prove prejudice, because he

did not show that such an investigation would have generated anything admissible at the time of trial.

On the other hand, the pleadings and supporting documents show that, years after the fact, three men, each with their own credibility problems, wrote [appellate counsel] Mr. Cornell some unsolicited and unauthenticated letters respecting Coursey and his versions of the events. But trial counsel's behavior must be viewed from his perspective at the time of the act or omission. From that perspective, a perspective anchored in *Strickland*, it is far from clear how or whether a lawyer would simply show up at the jail, uninvited, and really get anywhere with what would have been at that time three strangers, each with their problems.

Given the circumstances alluded to by the other inmates, Bergna most certainly could have been of considerable assistance in identifying these inmates for his lawyers, but it would appear that never happened. Accordingly, the Court finds that Bergna failed to show that counsel's lack of investigation was unreasonable here.

In addition, Bergna failed to establish prejudice. First, the letters accompanying the Petition were never authenticated, and none of the other inmates testified in our evidentiary hearing. As a result, the letters were inadmissible in any proceeding. Consequently, without the live testimony of the authors, there has simply been no showing that the result of Bergna's trial would have been different.

Exh. 283, pp. 9-13.   Bergna has not demonstrated that the Nevada courts unreasonably applied *Strickland*.

### Ground 5(E)

Bergna asserts that trial counsel failed to object to the admission of inadmissible evidence of alleged threats against witnesses for the State, namely inmate Coursey and Bergna's neighbor Cindy Glatz (ECF No. 55, pp. 112-113).  The Nevada Supreme Court affirmed the denial of this claim, explaining:

Appellant failed to demonstrate deficiency or prejudice.   Neither witness testified that appellant threatened them. Rather, the informant testified only that prison informants were not liked in prison and the neighbor testified that appellant had once made her uncomfortable by noting that he noticed that her husband was often away. Trial counsel testified at the evidentiary hearing that they did not object because they thought the better strategy was to impugn her credibility on cross examination. Further, appellant failed to demonstrate a reasonable probability of a different outcome at trial had trial counsel objected. Therefore, the district court did not err in denying this claim.

Exh. 297, p. 4.  The Nevada Supreme Court pointed out that the record belies Bergna's contention that these witnesses testified as to threats.  Bergna has not shown that the state supreme court's determination that he failed to show that counsel was ineffective or that he was prejudiced was an unreasonable application of *Strickland*.

**Ground 5(F)**

Bergna contends that trial counsel failed to object to the admission of victim impact evidence during the guilt phase of the trial (ECF No. 55, p. 114).  Bergna specifically points to the testimony of several family members that family was everything to Rinette.  The Nevada Supreme Court affirmed the denial of this claim as belied by the record because trial counsel filed a pre-trial motion to exclude this evidence, which was denied.  Exh. 297, pp. 2-3; Exh. 299, pp. 25-26.  This claim lacks merit.

**Ground 5(G)**

Bergna argues that trial counsel was ineffective because they failed to properly address several pieces of bad-act and bad-character evidence.

**Ground 5(G)(1)**

Bergna argues that trial counsel failed to seek exclusion of allegedly highly prejudicial testimony by a witness whose child was present when the television was turned on at Bergna's house and it was on the Playboy channel (ECF No. 55, pp.114-115).  The Nevada Supreme Court affirmed the denial of this claim, concluding that Bergna failed to demonstrate deficiency or prejudice.  The state supreme court pointed out that trial counsel testified at the postconviction evidentiary hearing that, because the trial court had already ruled the testimony admissible, they made a tactical decision to deal with it by undermining the witness's credibility on cross examination.  Exh. 297, p. 4.

Defense counsel Schwartz testified at the state postconviction evidentiary hearing that the witness was "ridiculous" and that the tactical decision was to "let her talk" because her testimony became more and more incredulous and bizarre.  Exh. 299, pp.

28-29 (*see also* exh. 277, pp. 17-20, defense counsel Puentes' similar testimony about that tactical decision).

Bergna has not demonstrated that the Nevada Supreme Court's rejection of this claim was an unreasonable application of *Strickland*.

### Ground 5(G)(2)

Bergna claims that trial counsel commented during jury selection that jurors would not hear any evidence that Bergna belittled his wife, but the jury later heard such evidence (ECF No. 55, p. 115).  The Nevada Supreme Court affirmed the denial of this claim, concluding that Bergna failed to demonstrate deficiency or prejudice.  The court pointed out that trial counsel testified at the evidentiary hearing that they did not believe that the State's evidence should be characterized as "belittling" and the court determined that this was a reasonable belief.  Exh. 297, p. 5.

Defense counsel Puentes testified: "I would today still say that no witnesses testified that Peter belittled [Rinette]."  Exh. 277, p. 21.  He stated that Bergna and his wife were married for several years and he did not view testimony about two or three arguments between spouses as evidence of "belittling."  *Id.* at 20-21.

This court notes that there is no evidence that defense counsel's comment was heard or considered significant by any of the jurors who were ultimately empaneled.  Further, this statement was made during jury selection before a lengthy trial.  It cannot be said that the Nevada Supreme Court's conclusion that Bergna did not show a reasonable probability of a different outcome at trial was unreasonable.

### Ground 5(G)(3)

Bergna argues that trial counsel did not seek a limiting instruction as to the evidence of uncharged misconduct that the State introduced (ECF No. 55, pp. 115-116).  The Nevada Supreme Court summarily affirmed the denial of this claim.  Exh. 297, p. 2.

The state district court explained that defense counsel declined the court's invitation to give the limiting instruction at least twice.  Defense counsel specifically

indicated that they were concerned that such instruction would highlight the testimony and possibly cause jurors to wonder why an instruction accompanied one lay witness and not another.  The court held that Bergna failed to demonstrate that the tactical decision was objectively unreasonable or that there was a reasonable probability of a different outcome had the instruction been given.  Exh. 283, pp. 18-19.

Defense counsel Puentes testified at the state postconviction evidentiary hearing that the State was obligated to offer the limiting instruction each time the evidence was presented but the State failed to do so until "late in the day."  Exh. 277, pp. 21-23.  The defense concluded that a limiting instruction at that time would bring more attention to Bergna's ex-wife's testimony.  Puentes explained that the second rationale was that it was the State's error, and therefore, it could potentially be an issue for appeal.  *Id*.

Here again, Bergna utterly fails to demonstrate how the state courts' disposition of this ground was unreasonable under *Strickland*.

### Ground 5(G)(4)

Trial counsel failed to correct the State's insinuation that Bergna was engaged to another woman four months after his wife's death, when he was not engaged until two years after his wife's death.  In affirming the denial of this claim, the Nevada Supreme Court pointed out that trial counsel testified at the state postconviction evidentiary hearing that the only way to present information about Bergna's relationship with his fiancée was to have one of them testify.  Trial counsel did not want that, and Bergna agreed with the strategy.  Exh. 297, p. 4.

Defense counsel Schwartz testified at the state postconviction evidentiary hearing that while Bergna was not engaged to another woman four months after Rinette's death, he began the relationship about that time, which "some people would consider to be a relatively short period of time after Rinette's death."  Exh. 299, p. 32.  The defense had already made the decision that neither Bergna nor his fiancée, Robin, would testify,

which would have been the way in which to correct that misstatement.  *Id.* at 32-33; *see also* exh. 277, p. 21-23 (defense counsel Puentes' similar testimony).

The state supreme court determined that Bergna failed to demonstrate a reasonable probability of a different outcome had evidence to clarify their relationship been presented, and here Bergna has failed to demonstrate that the affirmance of the denial of the claim was an unreasonable application of *Strickland*.

### Ground 5(G)(5)

Bergna claims that trial counsel failed to fully impeach Cindy Glatz on the basis that she had learned information from Rinette's former live-in boyfriend and that she displayed "odd" behavior such as climbing down the hill to the truck to retrieve Rinette's books and bathing nude in her front-yard hot tub (ECF No. 55, pp. 116-117).

The Nevada Supreme Court concluded that Bergna failed to show deficiency or prejudice and noted that he failed to produce any evidence to support the claims regarding the ex-boyfriend or hot tub.  Further, the neighbor was cross-examined about Rinette's things on Slide Mountain and the state supreme court determined that Bergna failed to show a reasonable probability of a different outcome had a more effective cross examination been conducted.  Exh. 297, p. 5.  Bergna has offered no evidence that Glatz based her testimony on what she learned from the boyfriend.  Respondents point out that the prosecution referenced Glatz in closing argument only as to the snowblower incident, which she witnessed (ECF No. 59, p. 65; Exh. 196, p. 7).

Bergna has failed to demonstrate that the affirmance of the denial of the claim was an unreasonable application of *Strickland*.

### Ground 5(G)(6)

Bergna contends that trial counsel failed to fully impeach Rinette's Italian aunt, Gianna Riella, by showing that there was a language barrier between Rinette and Gianna.  Bergna argues counsel failed to use correspondence between he and his wife that contained affectionate language and did not reflect any marital difficulties to

49

impeach Gianna's testimony that the couple was not in close contact (ECF No. 55, pp. 118-119).  The Nevada Supreme Court affirmed the denial of this claim as belied by the record because trial counsel inquired into the language barrier, the jurors could see that Gianna needed an interpreter, and counsel introduced the letters through another letter. Exh. 297, pp. 5-6.

Bergna includes in this ground a conclusory claim that trial counsel was ineffective for failing to file a motion to exclude Gianna's testimony that Rinette planned to buy a condominium in Italy as unreliable hearsay.  However, he fails to demonstrate that such a motion had any reasonable likelihood of success or of changing the outcome of trial.

Bergna has not demonstrated that the state supreme court's decision was unreasonable under *Strickland*.

### Ground 5(H)

Bergna claims that trial counsel failed to consult with a forensic expert in brake failure analysis, instead relying on a mechanic, and also failed to timely examine the brakes (ECF No. 55, p. 119).  The Nevada Supreme Court affirmed the denial of this claim because Bergna did not provide any evidence regarding what a forensic brake expert would have testified to, and therefore, failed to demonstrate deficiency or prejudice.  Exh. 297, p. 3.

Bergna has failed to demonstrate that the state supreme court unreasonably applied *Strickland*. This court notes that the state district court found that Bergna's defense team discounted a brake failure theory and only later after the first trial, took a "fresh look" at the brakes.  Exh. 283, pp. 24-25.  Thus, the trial court concluded that Bergna failed to show his counsel's approach was substandard under the particular circumstances.  *Id.*

Defense counsel Smith testified at the state postconviction evidentiary hearing that the defense considered hiring a forensic brake expert rather than a mechanic, but they had engaged a significant number of experts already and were growing concerned

about costs.  Exh. 277, pp. 87-88.  Also, Smith testified that he was unable to identify a discrete forensic specialty involving just brakes and that that generally falls within the purview of the testimony of an expert who worked in law enforcement and accident reconstruction.  *Id.*

### Ground 5(I)

Bergna argues that trial counsel failed to protect his right to present exculpatory evidence in two particular instances (ECF No. 55, pp. 119-121).

### Ground 5(I)(1)

Trial counsel failed to request the personnel file of State expert witness mechanic Dewey Willie, which revealed that Willie had been reprimanded for an act of dishonesty. Willie testified about his examination of the truck, including his assessment that the braking system was in working order.  In affirming the denial of this claim, the Nevada Supreme Court stated:

> Apparently, the same week that this expert testified, charges were sustained against him for twice falsifying timesheets.  Appellant failed to demonstrate that this evidence was material and therefore failed to demonstrate that counsel was ineffective for failing to specifically request the file.  Therefore, the district court did not err in denying these claims.

Exh. 297, p. 6.

Defense counsel Schwartz testified that based on Willie's testimony he assessed him as not particularly competent.  Exh. 299, pp. 40-41.  He acknowledged that such conduct could have been relevant to Willie's truthfulness, but stated that he was unaware of and had no reason to know about the timesheets issue.  *Id.*

This court notes that it is unclear whether evidence of the timesheets would have been admissible, and even if admissible, it likely would have had minimal impact as it would not have significantly undermined Willie's testimony about the brakes.  Bergna has not demonstrated a reasonable probability of a different outcome had defense counsel questioned Willie about the work reprimand.   He has not shown that the Nevada Supreme Court unreasonably applied *Strickland*.

### Ground 5(I)(2)

Bergna alleges generally that trial counsel failed to challenge the chain of custody of physical evidence introduced by the State, including the contents of the truck.  The Nevada Supreme Court did not specifically refer to this claim in its order affirming the denial of the state postconviction petition.  The state district court denied the claim in part as belied by the record because defense counsel filed a motion to dismiss, "which alluded to these omissions."  Exh. 283, pp. 30-31.  The district court further observed that Bergna failed to specifically identify what contents of the truck were collected and introduced at trial that lacked sufficient proof of a chain of custody.  The court found that

> Bergna simply failed to prove that counsel's failure to object at trial was unreasonable, or, if unreasonable, the objection would have been sustained, and, as a result evidence would have been excluded that would undermine the court's confidence in the outcome.

Exh. 283, pp. 30-31.  Defense counsel Smith testified at the state postconviction evidentiary hearing that he did not believe that a proper chain of custody was established for the evidence gathered from the mountainside.  Exh. 277, pp. 98-99.  He stated that the defense filed motions regarding the collection of evidence but he did not recall the specifics.  *Id.*

Bergna's federal ground 5(I)(2) is vague, and he fails to demonstrate that the Nevada Supreme Court's denial of any portion of ground 5(I) was objectively unreasonable under *Strickland*.

### Ground 5(J)

Bergna contends that trial counsel failed to file necessary motions and to fully preserve issues on all available grounds (ECF No. 55, pp. 121-122).

### Ground 5(J)(1)

Bergna argues that trial counsel failed to object on constitutional grounds to testimony by the State's experts because the experts relied on out-of-court material that was not admitted at trial.  In *Crawford v. Washington*, the United States Supreme Court held that testimonial evidence may not be admitted at trial unless the witness is

unavailable to testify and the defendant has had a prior opportunity for cross-examination. 541 U.S. 36, 68 (2004). Notably, (in relation to trial counsel's actions) this case was decided almost two years after Bergna's second trial concluded.

In affirming the denial of this claim, the Nevada Supreme Court concluded that Bergna failed to demonstrate that *Crawford* applies when an expert is relying on out-of-court materials not admitted at trial. Exh. 297, p. 6 (citing *Estes v. State*, 146 P.3d 1114, 1126 (Nev. 2006), declining to apply *Crawford* where a testifying doctor relied on opinions of non-testifying doctors). The court also held that Bergna failed to demonstrate a reasonable probability of a different outcome had counsel objected based on *Crawford*. Exh. 297, p. 6.

The state district court noted that in the unlikely event that a pre-*Crawford* confrontation clause objection had been sustained at trial, the State would merely have called the out-of-court declarants as witnesses or shown them to be unavailable. Thus, the court concluded Bergna was not prejudiced. Bergna has not demonstrated that the Nevada Supreme Court's affirmance of that decision was objectively unreasonable under *Strickland*.

### Grounds 5(J)(2) and 5(J)(3)

Bergna argues that trial counsel failed to object to the trial court's allegedly disparate examination of defense witnesses in comparison to prosecution witnesses (J)(2) and to the trial court's imposition of fines on defense counsel in the presence of the jury (J)(2). The Nevada Supreme Court did not specifically address these claims. The state district court found that Bergna failed to demonstrate deficiency or prejudice. Exh. 283, pp. 35-47.

In this court's disposition, above, of federal ground 4, it denied the claims underlying these IAC claims on the merits. Accordingly, Bergna cannot show that had counsel objected there was a reasonable probability of a different outcome at trial.[2]

---

[2] Moreover, defense counsel did, in fact, ask for and was granted a recess in order to lodge a formal objection regarding the court's questioning of Jarvis Michie. *See* exh. 277, pp. 150-110.

### Ground 5(J)(4)

Bergna claims that trial counsel was ineffective for failing to call Bergna's his trial counsel at a hearing regarding a misstatement by the State during the grand jury proceedings (ECF No. 55, p. 122).  The Nevada Supreme Court affirmed the denial of this claim on the basis that Bergna produced no evidence that the State made such a misstatement.  Exh. 297, p. 7.  The state district court had pointed out that while Bergna had submitted an affidavit purportedly by first trial counsel Pinkerton, Pinkerton did not testify at the postconviction evidentiary hearing nor was the affidavit admitted at the hearing.  The state district court also noted that the prosecutor alleged to have made the misstatement did not testify at the state postconviction evidentiary hearing on the subject.  Exh. 283, p. 47.  Bergna has not demonstrated here that the Nevada Supreme Court was unreasonable in determining that the claim lacked evidentiary support.

### Ground 5(K)

Bergna asserts that trial counsel failed to challenge three jurors for cause who viewed the nationally-televised "48 Hours" program about Bergna, the State's charges against him, and the first trial.  Defense counsel used a peremptory challenge against one of the jurors, but the other two, Flores and Benjamin, served on the jury (ECF No. 55, pp. 122-124).  The Nevada Supreme Court summarily affirmed the denial of this claim on the basis that Bergna failed to demonstrate prejudice.  Exh. 297, p. 2.

First, as this court discussed with respect to federal ground 3, above, the court and all counsel conducted extensive *voir dire* in an attempt to ascertain whether potential jurors were unwilling or unable to approach the trial impartially.  Second, third, and fourth, as the state district court pointed out, all the empaneled jurors indicated that they had either seen the program or heard about it, defense counsel Puentes testified at the postconviction evidentiary hearing that—while they may have felt differently after the trial—the defense had wanted Flores on the jury, and defense counsel Smith questioned Benjamin at length after she indicated that she had seen media accounts.

54

Exh. 283, pp. 47-49; exh. 277.  Finally, defense counsel Schwartz testified that the court made it clear that it was not going to permit challenges for cause of jurors who indicated that they would be able to put aside any preconceived bias and that his typical strategy is to decline to make cause challenges unless he thinks they will be successful.  Exh. 299, pp. 70-72.

No evidence suggests that counsel was deficient in not challenging these jurors for cause, and no evidence suggests that any challenge would have been granted. Bergna has not demonstrated the Nevada Supreme Court unreasonably applied *Strickland*.

### Ground 5(L)

Bergna argues that trial counsel were ineffective when they failed to request a jury instruction on the defense theory of the case that the crash was an accident and an instruction that the jury could not return a guilty verdict based upon negligent driving or mere failure to take corrective action, such as applying the parking brake, steering away from the guardrail, or not moving the gear shift to park (ECF No. 55, p. 124).

The Nevada Supreme Court summarily affirmed the denial of this claim, concluding that Bergna failed to show prejudice.  Exh. 297, p. 2.  The state district court acknowledged that a properly worded instruction on this theory likely would have been given.  However, the court found that

> Bergna failed to prove that counsels' failure to request them was unreasonable in this case.  This is particularly true where, as here, (1) the jury was instructed on express malice, the specific intent to kill, willfulness, deliberation and premeditation, and (2)  counsel argued that accident, negligent driving and a mere failure to take corrective action cannot be reconciled with nor establish express malice.  In fact, defense counsel went to considerable lengths to argue all of these exculpatory theories as they tried to show the jury that the State had not proven *mens rea*. Obviously, the absence of these instructions did not inhibit counsel's argument.  As a result, assuming counsel should have proffered these instructions, Bergna was not prejudiced by counsel's failure to request them, and their absence did not have a substantial and injurious effect or influence in determining the verdict.

Exh. 283, pp. 49-50; exh. 205, jury instructions nos. 25-29.

Defense counsel Schwartz testified at the state postconviction evidentiary hearing that he thought the jury instructions, as a whole, provided the necessary language and instructions to the jury for the defense to be able to argue its case.  Exh. 299, pp. 73-75.

Bergna has not demonstrated that the Nevada courts' determination that he failed to show prejudice is an unreasonable application of *Strickland*.

### Ground 5(M)

Bergna claims that the cumulative effect of the errors asserted in Ground 5 violated Bergna's right to effective assistance of counsel (ECF No. 55, p. 124). Generally, a separate cumulative error claim for ineffective assistance of counsel is either noncognizable or duplicative of the underlying ineffective assistance claims.  In any event, Bergna has not demonstrated any errors of counsel to cumulate.

In sum, Bergna has failed to demonstrate that the Nevada Supreme Court's decisions on any of ineffective assistance of trial counsel claims set forth in federal ground 5 involved an unreasonable determination of fact or were contrary to or an unreasonable application of *Strickland v. Washington*.  28 U.S.C. § 2254(d)(1) & (2). Federal habeas relief is denied as to the entirety of ground 5.

### ii.  Ground 6

Bergna next alleges several instances of ineffective assistance of appellate counsel.

### Ground 6(A)

Bergna claims that appellate counsel failed to make simple formatting changes to the opening brief to the Nevada Supreme Court, which prevented him from raising all the issues that he wanted to present (ECF No. 55, pp. 127-130).  The Nevada Supreme Court summarily affirmed the denial of this claim on the basis that Bergna failed to demonstrate prejudice.  Exh. 297, p. 8.

Here, Bergna only states in conclusory fashion that the omitted claims were meritorious (ECF No. 55, p. 129).  He fails to demonstrate that the omitted claims had a reasonable probability of success.  He therefore has not demonstrated that the Nevada Supreme Court unreasonably applied *Strickland*.

**Ground 6(B)**

Bergna contends that appellate counsel failed to federalize several issues raised on direct appeal, including issues related to prior bad acts and character evidence, opinions as to whether Bergna's grief was genuine, the destruction of certain evidence and preservation of certain evidence, and the failure to give the defense-proffered instruction on proximate causation.

The Nevada Supreme Court summarily affirmed the denial of this claim on the basis that Bergna failed to demonstrate prejudice.  Exh. 297, p. 8.  Appellate counsel testified at the postconviction evidentiary hearing that he looked back at the appeal after the Nevada Supreme Court affirmed the conviction and realized that he had failed to federalize several claims.  Exh. 276, pp. 22-29.

In denying this claim, the state district court concluded that Bergna had failed to prove that federalizing claims is the prevailing professional norm.  Exh. 283, p. 54.  Here, Bergna merely reiterates his view that appellate counsel should have argued—in addition to arguing state-law violations—that Bergna's federal constitutional rights were violated.  He presents nothing to demonstrate that any of these claims had any likelihood of success as federal constitutional claims.  He has not demonstrated that the Nevada courts unreasonably applied *Strickland*.

**Ground 6(C)**

Bergna argues that appellate counsel failed to request permission to file a supplemental brief after the decision issued in *Crawford v. Washington*.  Exh. 276, pp. 29-34.  This court has already denied relief as to Bergna's claim that trial counsel was ineffective for failing to object to portions of Dr. Turner's testimony based on *Crawford*.

This court has determined that the Nevada courts' determinations that Bergna failed to demonstrate that *Crawford* was applicable and that in any event he failed to show prejudice were not unreasonable.  *See* ground 5(J)(1).  Therefore, Bergna cannot demonstrate that he was prejudiced by appellate counsel's failure to seek to file a supplemental brief based on *Crawford.*

### Ground 6(D)

Bergna asserts that appellate counsel was ineffective in his presenting the destruction of evidence issue (ECF No. 55, pp. 136-137).  Specifically, Bergna contends that while appellate counsel argued that Bergna suffered prejudice because DNA testing of the airbag could not be performed, he failed to present the more compelling issue that cornstarch residue from the deployed air bag in the truck might have confirmed that Bergna was in the truck when it initially went over the cliff.  However, as discussed earlier with respect to a related destruction of evidence claim, Bergna has failed to allege, much less demonstrate, bad faith on the part of the State, and therefore, failure to preserve potentially useful evidence does not constitute a denial of due process of law.  *Youngblood*, 488 U.S. at 58.  Accordingly, he cannot demonstrate that any alleged deficiency with respect to how appellate counsel presented the destruction of the airbag issue was prejudicial.

### Ground 6(E)

Finally, Bergna contends that appellate counsel failed to raise several meritorious issues on appeal (ECF No. 55, pp. 137-146).  The Nevada Supreme Court summarily affirmed the denial of this claim for failure to show prejudice.  Exh. 297, pp. 7-8.

The United States Supreme Court has held that appellate counsel need not raise every nonfrivolous claim, but should select from among them in order to maximize the likelihood of success on appeal.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  In *Smith v. Robbins*, the Court further explained that it is possible to bring a *Strickland* claim based on appellate counsel's failure to raise a certain claim, but that it is difficult to

demonstrate that counsel was incompetent.  528 U.S. 259, 288 (2000).  A petitioner bears the burden of showing that a particular nonfrivolous issue was clearly stronger than the issues that counsel presented.  *Id.*

First, Bergna argues that appellate counsel failed to raise 6E(1): sufficiency of the evidence and lack of proof of criminal agency; 6E(2): pre-indictment delay/destruction of or failure to preserve evidence; 6E(3): admission of Dr. Turner's testimony; 6E(4): introduction of prejudicial bad acts testimony; 6E(7): unconstitutional restrictions on Bergna's right to confront the State's witnesses and challenge the State's evidence against him; 6(E)(8): introduction of extensive evidence about inmate Darrell Coursey's religious beliefs; 6(E)(10): denial of the motion for change of venue; 6(E)(11): trial court's refusal to permit use of a jury questionnaire and the jury selection process; and 6(E)(12): trial court's fining of defense counsel and extensive examining and impeaching defense witnesses only.

At the state postconviction evidentiary hearing, appellate counsel testified to his strategic decisions with respect to which claims to raise on appeal.  Exh. 276, *see*, *e.g.*, pp. 41-44, 52-56, 79, 90-91.  He testified to his view that the Nevada Supreme Court was not very receptive to sufficiency of the evidence claims at that time.  He stated that he was unaware of a valid basis to challenge the admission of Dr. Turner's testimony, noted that it was for the jury to determine what weight to give Turner's testimony, and noted that Turner was extensively cross-examined.  *Id.*  Counsel testified that he looked closely at the transcript of Jarvis Michie's testimony in considering any judicial bias claims and concluded "for appellate issues that issue [was not] going to get me anywhere." *Id.* at 55.  Moreover, this court has denied earlier in this order either the grounds that raised the underlying substantive claims or the grounds that raised these claims as claims of ineffective assistance of trial counsel.  Thus, Bergna cannot demonstrate prejudice as to appellate counsel's failure to raise these claims.

Next, Bergna claims that appellate counsel failed to raise 6(E)(5): the admission of lay and expert witness testimony as to their opinion of Bergna's guilt; 6E(6): the admission of lay and expert witness testimony about the existence of a phantom, unsigned will; 6(E)(9): prosecutorial misconduct throughout the trial; 6(E)(13): the district court's refusal to permit a nighttime viewing of the crime scene, while permitting the State to impeach a defense expert who prepared a video of the scene at night because he did not know full details about the lighting configurations of his camera; and 6(E)(14): alleged juror misconduct.   He also argues that 6(E)(15): appellate counsel was ineffective for failing to file a timely motion for new trial upon learning of new evidence as well as cumulative error (ECF No. 55, pp. 137-146).

Appellate counsel testified at the postconviction evidentiary hearing that this had been one of the most difficult cases he had ever handled in terms of choosing which issues to raise on appeal, and he discussed several strategic decisions he made.   Exh. 276, *see e.g.*, pp. 71, 77, 91-101.   He testified that he believed a defense expert lawyer—who answered a hypothetical question about a will—was the best witness in the whole case.   He noted that the trial court in fact sustained an objection to a lay witness' testimony about Bergna's guilt.   He testified that in his experience, it was highly unlikely that the state supreme court would conclude that the trial court abused its discretion with respect to the issues regarding viewing the crime scene and the video. He also testified that he believed any newly discovered evidence was to be raised as a postconviction claim for relief.   Id.

Appellate counsel need not raise every nonfrivolous claim.   Bergna does not even attempt to argue that any of the claims in federal ground 6(E) were clearly stronger than the issues that counsel raised on appeal.   *Robbins*, 528 U.S. at 288.   Thus, he has not demonstrated that the Nevada Supreme Court's affirmance of the denial of this claim was contrary to or an unreasonable application of *Strickland* or involved an unreasonable determination of fact.   28 U.S.C. § 2254(d).

As discussed above, federal relief is denied as to federal ground 6.

The petition, therefore, is denied in its entirety.

### IV.   Certificate of Appealability

This is a final order adverse to the petitioner.   As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA).   Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA.   *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."   With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).   For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.   *Id.*

Having reviewed its determinations and rulings in adjudicating Bergna's petition, the court finds that none of those rulings meets the *Slack* standard.   The court therefore declines to issue a certificate of appealability for its resolution of any of Bergna's claims.

### V.   Conclusion

**IT IS THEREFORE ORDERED** that the amended petition (ECF No. 55) is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly and close this case.

DATED: August 23, 2016

ROBERT C. JONES
UNITED STATES DISTRICT JUDGE